GILL, J.
 

 This is a petition brought by the commissioner of the department of children and families (department) alleging that Alana, now nine years of age, and her sister, Lea, now six years of age, are abused, neglected and uncared for. The respondents are the children’s biological parents, Francis, a retired firefighter, and Antonia, a manufacturing employee.
 

 What ensued in the present case as a result of this petition is perhaps unparalleled in the state of Connecti
 
 *238
 
 cut in terms of parental manipulation of our system of justice. The present case presents an incredible range of tactics by the respondents to thwart justice and to prevent the court from conducting an orderly and timely process to resolve these serious claims. Unfortunately, our judicial process is not the only victim. The two children are also victims. These two young children, because of the machinations of their parents, particularly their father, have had their identities revealed at least five times in newspaper articles, on a radio talk show and on television in violation of the law and they have had no closure or healing for over a year. They had to go to school each day knowing that their classmates might know these confidential matters and to suffer the resultant embarrassment.
 

 Because of the unique nature of the present case, the court intends to present in great detail, the
 
 total
 
 picture of these grim proceedings.
 

 It will become immediately apparent that the respondent, Francis, has, with the help of others, engaged in an overt campaign to control thése proceedings and their participants in order to avoid a judicial determination of these matters on the merits. He apparently hoped to usuip the judicial process by ignoring it, by contemptuously not complying with judicial orders, by ducking subpoenas and capias writs held by the Connecticut state police and by pleading his case on an ex parte basis with an accommodating newspaper columnist and television news reporter, rather than in a court of law. According to the sworn statements of his wife, this bizarre behavior can be expected of Francis as “he avoids or leaves people or situations that are difficult or stressful or challenging to him.” In fact his wife stated her belief that Francis “thinks that the solution to the pending petitions is to leave the state of Connecticut, which would not be in the best interests of my daughters.”
 

 
 *239
 
 The court finds the following facts. In January, 1994, the respondents and their three children were living in the state of New Hampshire. One child, Thomas, is not involved in these proceedings.
 

 On January 27,1994, Antonia, the respondent mother, filed a domestic violence petition in the district court in New Hampshire. She swore under oath that the respondent, Francis, owned guns and had threatened her. She noted that she had had a previous restraining order against Francis in Connecticut. Antonia swore that she was in an immediate and present danger of abuse by Francis. She requested that the New Hampshire court allow her to take her children and their belongings back to Connecticut. She swore that Francis was an alcoholic who drank in their home and punished his children by turning the heat off in January in New Hampshire.
 

 Antonia asked the New Hampshire court to do the following: (1) find that she was in immediate and present danger of abuse by Francis; (2) restrain Francis from interfering with her person or liberty; (3) restrain Francis from entering any premises where she might reside; (4) award temporary custody of all three children to her; (5) restrain Francis from contacting her at her place of employment; (6) restrain Francis from harassing,
 
 intimidating
 
 or threatening her or her relatives or children; (7) direct Francis to relinquish to a police officer any deadly weapons that may have been used or threatened to be used; (8) find that Francis has abused her under New Hampshire law; (9) award her exclusive use of their residence and furnishings; and (10) direct Francis to make child support payments for the minor children.
 

 As a result of her sworn petition, the New Hampshire court found on February 2, 1994, that she was in fact in immediate and present danger of abuse by Francis.
 
 *240
 
 The court ordered all of the requested protection against Francis while awarding custody of the children to Antonia.
 

 As is the case with most domestic violence petitions, this was granted ex parte and a hearing date was set for February 16, 1994. Both Francis and Antonia appeared for the hearing on February 16, 1994. After the hearing, the New Hampshire court entered the following orders: (1)
 
 All
 
 of the court orders of February 2, 1994, were extended until June 1, 1994, or until such time as other orders might be entered in the couple’s divorce case in the New Hampshire Superior Court scheduled tentatively for May 6, 1994. (2) Francis was to have unsupervised visitation with his children every other weekend on Saturday from 1:30 p.m. to Sunday at 5:30 p.m. This visitation was to begin at the Northampton, Massachusetts, police department and conclude there as well, unless the couple agreed to another locale. This visitation would not start for one month and Francis was ordered not to drink any alcoholic beverages during visitation or for twenty-four hours before visitation. (3) This restraining order was transferred to the divorce case and all protective orders “shall remain in full force and effect.” Francis was represented by counsel during the forgoing proceeding. Antonia apparently was not represented.
 

 The family moved back to Connecticut and eventually reunited. Alana has been in five different schools from kindergarten through third grade, in as many different towns.
 

 The final school was an elementary school where she attended third grade. The third grade had a question box that was part of its health program. On February 17, 1995, Alana wrote a note and put it in the question box for her teacher to read.
 

 
 *241
 
 The printed note read as follows: “How do you get people to stop touching your privet parts of yourself, don’t talk about in class. Alana.”
 

 The conscientious teacher read the note and spoke with Alana privately. Alana told the teacher that it was her father who was touching her but that she was not supposed to tell anybody. She also said that her father was touching her younger sister as well. Alana told the teacher that her father would pin her arms down when she tried to get away. The teacher told Alana to talk with her mother about this in order to make her father stop. Alana said that she had told her mother once but the touching did not stop.
 

 The teacher is a mandated reporter of abuse, and, on the same date, February 17,1995, filled out the mandated report form to the department of children and families (department) and an investigation was undertaken by social worker Sandra Fitzpatrick of the department. The reported sexual abuse was coded “emergency,” which requires that the department make contact with the family and child within two hours.
 

 Fitzpatrick launched her investigation immediately. She went to the elementary school at about 2:30 that afternoon. Because Alana was a bus student, Fitzpatrick sought to speak to Alana immediately. Fitzpatrick was told that the school authorities felt Alana was a reliable reporter.
 

 Fitzpatrick then interviewed Alana in a secluded area of the school in the presence of Alana’s teacher. Fitzpatrick reported that Alana was very serious and very solemn. Alana, who was eight years of age at the time, reported that her mother worked and that her father was home all day. Fitzpatrick tested Alana’s suggestibility by asking her the names of some colors and then trying to get her to change what she had said. Alana refused to change.
 

 
 *242
 
 Alana was able to describe good and bad touches. She said good touching was shaking hands or hugging. She went on to say her father touched her private parts and that she did not like it. Alana also said that she had told her father to stop, but he would not stop.
 

 After that initial interview, Fitzpatrick telephoned her supervisor and discussed the interview with Alana. It was decided to contact the police to proceed further with the investigation. Fitzpatrick met with Trooper Keith of the Connecticut state police and the two went to Alana’s home that evening. Both parents were home. Alana was sleeping on the couch and Lea was in the back room sleeping.
 

 Fitzpatrick and Keith explained to the parents why they were there. Francis immediately became hostile and irate. He became unreasonable and would not even discuss the allegations. He wanted to speak to his lawyer first. Francis then telephoned attorney James Caulfield.
 

 At this point in the investigation the authorities were trying to do a risk assessment based upon as much information as they could possibly gather. Francis contributed no information. Antonia agreed to be interviewed and agreed to have her husband out of the home until a complete assessment of these allegations was made. The safety of the children was a reasonable concern.
 

 Antonia reported to Fitzpatrick that Alana had a self-esteem problem and had moved five times. Antonia said she could not believe in her heart that her husband had done anything. She was then asked if Alana had ever told her anything like this on a prior occasion. Antonia said: “Yes, a year ago.” She said the child did not like it, but did not give any details. While there Lea was heard to whisper to Alana: “Don’t tell he pulls my pants down.”
 

 
 *243
 
 Because Antonia was willing to have her husband leave the house pending further investigation, Fitzpatrick did not seek an order of temporary custody or a ninety-six hour hold, as authorized by law.
 

 As part of assessing whether child sexual abuse had occurred, Fitzpatrick suggested that the child abuse investigation team become involved. This professional team consists of a medical doctor, a sexual abuse specialist and a lawyer. Fitzpatrick spoke to both parents about the need for additional information about the allegations of sexual abuse to Alana. Both parents were asked to sign a release so that Alana could be contacted by the child abuse investigation team. Both parents, Francis and Antonia, refused to sign the release. Francis again refused to be interviewed because he wanted his lawyer present. Fitzpatrick tried to accommodate Francis by having his lawyer present with him as she believed that it was in the best interest of the child to have both parents cooperate. Fitzpatrick subsequently met with Francis and Caulfield, his attorney.
 

 Fitzpatrick started to ask Francis some routine questions that are normally asked in such investigations. Francis was again hostile, and his attorney said that he wanted Fitzpatrick to answer questions before Francis would answer any of Fitzpatrick’s questions. At that time Fitzpatrick said that perhaps she should hold off and have her lawyer present as she was feeling threatened by both Francis and Caulfield.
 

 Eventually Francis answered some questions but refused to answer many questions. Fitzpatrick gave a few examples of the preliminary questions that Francis refused to answer.
 

 He refused to answer where he had lived prior to his present address or if he was stressed. His lawyer advised him not to answer the question whether he drank alcohol. He was asked if he had any knowledge
 
 *244
 
 of Alana bursting into tears and being upset. He refused to answer.
 

 Fitzpatrick explained to Francis that they needed an explanation of why Alana was reporting this and that they were just trying to figure it out for Alana’s best interest. Francis remained uncooperative and became upset about a medical release he was asked to sign. He did say, however, that he did pull the girls’ pants down in the course of playing.
 

 Subsequently, Fitzpatrick asked to meet with Antonia. Antonia said she did not feel another meeting was necessary. Antonia said that in her opinion the allegations were not what they appeared to be and that Alana had only asked a general question in her note and was not referring to any sexual abuse of herself. After a certified letter to Antonia requesting a meeting with Fitzpatrick was ignored, the state filed the present petition on March 6, 1995.
 

 On April 7, 1995, Antonia was presented to the court before Judge Doherty, who, later that day, granted a motion for a comprehensive abuse evaluation and physical examination of Alana. Cheryl A. Outland, a pediatrician, of Saint Mary’s Hospital, was designated to be the medical evaluator. Shortly thereafter, on April 25 and on April 28,1995, respectively, counsel for the respondents filed a motion for articulation of this routine court order, Attorney Timothy Moynihan filing for Francis and Attorney Jennifer Davis filing for Antonia. Davis was the first of six attorneys who would eventually represent Antonia as of this date, including Caulfield, Francis’ present attorney.
 

 Judge Doherty refused to reconsider his order. The evaluation he ordered was to be conducted by Outland at Saint Mary’s Hospital and was to take place on May 23, 1995.
 

 
 *245
 
 Social worker Gail Galloway from the department was present on May 23, 1995, at Saint Mary’s Hospital to oversee the medical examination. She noticed that Michael Goggin, a uniformed Waterbury police officer, was standing behind Francis. She did not realize at the time that the uniformed officer was with Francis.
 

 Galloway introduced herself to Outland and was invited into the examination room with the physician, Antonia and Alana. Francis and the police officer came into the room after Galloway. It was at this point that Galloway realized that the police officer was accompanying Francis.
 

 Galloway reports that the unusual presence of a police officer at a child’s medical examination was very threatening.
 

 Outland said that she had been told by Francis’ attorney that she could physically examine Alana but
 
 not
 
 ask her any interview questions. Outland explained that professionally and ethically she could not conduct such a limited evaluation. Francis insisted in front of everyone, including the child, that she could only perform a physical examination. In Galloway’s estimation, the presence of the police officer reinforced Francis’ position. Telephone calls were made to Judge Doherty to rule on the impasse, and the officer remained throughout this process.
 

 Judge Doherty was reached at the Superior Court in Danbury and subsequently telephoned Outland to clarify his order. Several hours had elapsed during this delay and because there was no longer sufficient time for the evaluation, it was cancelled. In a long letter of complaint by Antonia to Governor John Rowland, she criticized Judge Doherty as not being an “impartial judge” because he called to verify that this examination was to be conducted exactly the same as every other such medical examination in the world is done.
 

 
 *246
 
 Alana was reported to appear very pale as she sat in the examination room. She and her mother were also reported to appear “intimidated and upset.” Meanwhile, Francis was “having words” with the financial officer at the hospital and was “hostile and angry” during the entire process.
 

 The child abuse investigation team’s evaluation was vacated and, on June 9, 1995, Judge Doherty ordered that the sexual abuse evaluation team at Saint Francis Hospital in Hartford,
 
 interview
 
 and
 
 examine
 
 Alana. Francis was ordered
 
 not
 
 to be present at Saint Francis Hospital. A complaint was filed with the Waterbury police department regarding the officer’s presence at Alana’s medical examination and was reviewed by Captain Joseph Cass of that department.
 

 On June 15, 1995, Antonia applied for a restraining order, with the assistance of her lawyer, against Francis in Superior Court. She swore under oath to the court the following: “(1) I am over the age of eighteen and understand the meaning and obligation of an oath. (2) I reside in . . . Connecticut. (3) I have been married to Francis . . . since February 20, 1987. (4) He and I are respondents in pending petitions before the Juvenile Court . . . concerning our daughters, Alana and Lea. (5) I have agreed to allow my daughter Lea to be interviewed by Detective John Vaz and Linda Foster, M.S. W., with respect to these petitions, over my husband’s objection. (6) My husband told me on Tuesday, June 13, 1995, that if I allowed Lea to be interviewed that he would file for divorce. (7) On that same date, my husband told me that he would be leaving our home on Friday, June 16,1995, after packing some of his personal items. (8) On that same date, my husband suggested to me that he and I should leave the state with our children, to get away from the pending petitions. This is not the first time he has said that we should leave the state, and he has said to me before that we should return to
 
 *247
 
 New Hampshire. (9) On June 12, 1995, I overheard my husband talking to a mutual friend on the telephone, and he said to her that he thought that he would be returning to New Hampshire soon. He said I lived in New Hampshire from September, 1993, to September, 1994. (10) My husband and I do not own property in New Hampshire, but we do maintain liquid assets in that state, which constitute our joint savings. (11) My husband has begun drinking again, and when he drinks he becomes angry, loud and argumentative. On Sunday, June 4, 1995, my husband was drinking, had an argument with me regarding my son Thomas . . . who lives with us, and then he left our home. The children were at home during this argument. I did not hear from him again until he returned Tuesday evening, June 6th. I do not know where he was for that time period. When we lived in New Hampshire, he left the children and me for two weeks, and we did not know where he was. Since we were married, he has left me approximately five times, lasting anywhere from forty-eight hours to two weeks. He did not always inform me of his whereabouts during those times, although sometimes I was able to locate him. (12) I am afraid that my husband is planning on leaving the state of Connecticut on Friday, June 16th, and returning to New Hampshire because he is angry over the allegations concerning our family. My knowledge of his nature after eight years of marriage indicates that he avoids or leaves people or situations that are difficult or stressful or challenging to him. (13) I am afraid that my husband will take the children and will not tell me where he and they are, because he left us for that forty-eight hour period only last week. (14) It is not my intent to admit or substantiate any of the allegations of the pending petitions, but only to protect my children and ensure that they are not removed from the state of Connecticut. I believe that my husband thinks that the solution to the pending petitions is to
 
 *248
 
 leave the state of Connecticut, which would not be in the best interest of my daughters. (15) My husband is not currently employed in the state of Connecticut, and has no familial or employment ties that would cause him to remain here. (16) My husband has threatened me in the past with a gun, and I know that he still possesses that gun, which he sometimes keeps in the house and other times keeps in his car. When my husband is drinking, he is unpredictable and frightening to me, and he has begun drinking again, since the filing of these petitions. (17) I am afraid that if my husband stays in our home, he will continue drinking, and frightening me and the children.”
 

 The court then granted this petition for the restraining order and set a date for a hearing on the application.
 

 On October 11, 1995, this court granted the commissioner of children and families (commissioner) permission to intervene in the civil restraining order. The commissioner informed the court that Judge Doherty of the Superior Court for Juvenile Matters had deferred the issue of protection of the children to this court because of the restraining order and that it was believed that Antonia was now going to support her husband’s efforts to dissolve the civil restraining order. This being the case, the commissioner might have to take immediate action and remove the children from the mother as well. This was an eventuality that none of the parties nor the court cherished.
 

 All of these proceedings and all subsequent proceedings in this matter were held in a closed courtroom pursuant to law and with full confidentiality as to testimony, exhibits and pleadings.
 

 The commissioner requested that her case proceed on October 11, 1995, because her first witness, Diane Edell, had to leave the state because of a medical problem in her family. Edell is employed by the department
 
 *249
 
 of pediatrics of Saint Francis Hospital and is the coordinator of and interviewer for that hospital’s child abuse diagnostic program. Edell is a licensed social worker and holds a master’s degree in social work from Columbia University as well as a master’s degree in public health from Harvard University. Her credentials are impressive. Further, she has participated in the evaluation of over 250 children wherein there were claims of sexual abuse. Edell evaluated Alana on August 1, 1995. She reviewed all of the department’s file prior to the evaluation. The evaluation was videotaped and eventually all the lawyers and those parties who chose to do so reviewed it. The sound and picture quality of the tape was extremely poor. Alana was told twice on the tape that she was being taped. Not a terribly comforting reminder for a child who may be talking about her sexual abuse on a tape for viewing by the alleged perpetrator, who is also her father and who may eventually see that tape. The dual warning perhaps inhibits truth rather than produces it. It became readily apparent during cross-examination of Edell by Francis’ attorney that Francis’ trial position was that he had only tickled his daughter on her belly and not in a sexual area. He would take that posture everywhere he traveled to sell his side of the story to any willing newspaper or television reporter, showing them, illegally, selected transcripts and other documents from some of the closed court proceedings. Francis found several friendly but uninformed ears and has had his version of this tragedy supported in newspaper columns, an editorial, a radio talk show and a television report. That latter even included a silhouetted depiction of a father harmlessly tickling his daughter with the daughter giggling. Nothing this court reviewed in that television production resembled what it heard and saw in this courtroom. The court heard no reports from anyone, including the child, that anybody was giggling when he touched her “there.”
 
 *250
 
 “There” according to the child’s own drawing is in the pubic area where hair is present on mature females. Rational and caring fathers do not touch their daughters “there” under any circumstances. It is particularly obnoxious that this gross activity continued after he had been asked not to by his daughter.
 

 The television reporter was so caught up in Francis’ version that he even changed the wording of the child’s letter of complaint to her teacher. Her letter of complaint asked, “How do you get people to stop
 
 touching your privet parts
 
 of yourself?” (Emphasis added.) Francis’ inspired television version said the child’s complaint was for “tickling below your belly button.” There is a world of difference between the two.
 

 Edell said that Alana “made a clear distinction between tickling when he used to tickle her. She said it was fun. Things changed and that’s when she began to care about it. The language changed and it became ‘down there.’ It wasn’t fun anymore and she wanted it to stop.”
 

 When the child was asked if her father was touching her private parts, specifically her vagina, she said “sort of.” The child said that this touching occurred five times. The child also suggested that someone should talk to her father to get him to stop and she thought that what the authorities needed to do was to take blood from her father’s fingertips and match them to the germs in her panties to see if the germs in her panties were in the blood of his finger and then question him.
 

 The testimony of Edell this first day of hearing revealed another important and regrettable side to the present case that neither father nor media have taken into account. That is the impact upon a child when the denying and unbelieving adults make the child feel that she was wrong for reporting this activity and that she
 
 *251
 
 is now to blame for all of the family disruption. The real cause,
 
 and only cause
 
 for the family disruption was her father’s lack of cooperation with the authorities, including the court process, from day one.
 

 Alana now tells Edell that it was her fault for reporting and that she should not have done that. That is an inhumane position in which to put a child and Francis is solely responsible for her anguish.
 

 Children should not have to cany that burden. It is not emotionally healthy for a child of tender years to carry the burden of whether her family is together. One needs no special medical training to reach that conclusion. Common sense will suffice. This poor child wanted nothing more than for this type of touching to stop. Unfortunately she does not have a father who would agree to stop. Court adjourned at 6:50 p.m. on the first day of testimony. The first step in Francis’ campaign to subvert our system of justice and to prevent a timely and orderly process from occurring began when both he and Caulfield, his lawyer, ordered a transcript of the entire October 11,1995 hearing. Ostensibly this transcript was needed for a juvenile hearing. In fact, it would be the first of three transcripts to be given illegally to the media by Francis. Ironically, his attempts to thwart justice
 
 alone
 
 accounted for him not seeing his children for over one year, a factor that he did not make sufficiently clear in his media trial. Revealingly, Francis is so egocentric and narcissistic that he never once mentioned the negative impact upon his children, who also are emotionally strained by not having contact with their father, an outcome that was always in his power to change. He elected not to do so. It is the zenith of chutzpah for him to seek pity for his separation when he alone caused it.
 

 The second step in the campaign was a letter, over the signature of Antonia, to Governor John Rowland
 
 *252
 
 on October 22, 1995, defending her. husband and attacking the department, the police, the courts and anyone else who did not accept what she had personally concluded to be the truth.
 

 The next hearing date was November 1, 1995, when Antonia appeared with yet another lawyer, who immediately called her to the stand to state that she had no objection to her husband’s request that her restraining order be dissolved. She testified under her husband’s watchful stare. This would be the last time Francis would ever attend a court hearing in these matters, apparently choosing the media forum to present his side of the story, without cross-examination or challenge. Antonia dutifully ordered a transcript and passed it on to her husband, who then passed it to reporters, all in violation of the law.
 

 On November 8, 1995, the commissioner filed a motion to consolidate the civil restraining order hearing with the juvenile neglect and abuse petition pursuant to General Statutes §§ 46b-15 and 46b-129. The motion noted that a trial at the Juvenile Court would not occur until spring of the following year, 1996. The commissioner pointed out that both Francis and Antonia had asked that the trial be expedited.
 

 The court granted the motion to consolidate, noting the stated wishes of the respondents for a speedy conclusion, that it was in the interest of judicial economy not to duplicate the taking of evidence and that it was in the best interest of the children to have a speedy conclusion. This motion was granted on November 8, 1995, and trial dates were chosen during Thanksgiving week, 1995. A transcript of the proceedings on November 8, 1995, was ordered by Antonia and, upon information and belief, delivered to Francis, who delivered it to the media.
 

 
 *253
 
 On November 21, 1995, the next trial date, as the hearing was set to resume, Francis’ attorney filed a motion to reconsider and reargue the motion to consolidate that this court had granted on November 8, 1995. The gravamen of this request was fascinating. First, by his attorney, Francis withdrew his motion to dissolve the civil restraining order. This meant that he consented to that order, which provided that he was to have no contact with his children!
 

 He then argued that since there were no longer two actions pending, the court’s previous concerns about duplicative hearings and judicial economy were no longer valid. He argued that the remaining juvenile matter, properly before one session at this court, be returned to the Superior Court for Juvenile Matters at another location. This proposed motion would delay the hearing for at least six months at a time when eveiyone, including Francis, had been urging a swift determination.
 

 Francis’ attorney also suggested that a second reason for a return to the Superior Court for Juvenile Matters was his concern that this court would not protect the confidentiality of the children involved in the present case. In view of Francis’ subsequent disclosure of transcripts and briefs to newspapers, radio and television, perhaps with the acquiescence of his lawyer, all of which disclosed the identity of the children, which this court is bound to protect, this argument must appear to be less than seriously made by Francis.
 

 The court decided not to relinquish the case. First, the confidentiality issue was carefully considered and ruled upon. Every morsel of this hearing was in a closed and protected courtroom. Further, the children whom the court was trying to protect here were never in this courthouse, much less this courtroom. Second, the
 
 *254
 
 hearing was ready to proceed, trial days were scheduled, counsel and witnesses were ready and court time was available.
 

 After this ruling the court asked the parties to continue the evidence. At that point, Francis’ attorney interjected on what he called “an administrative matter.” He asked that the hearing be continued because of Francis’ health and he proffered anote from aphysician, dated the previous day, which stated that Francis was under his care for cardiac problems and that his health would suffer if he were exposed to stress. The physician recommended that Francis be excused from appearing in court until his condition had stabilized. The physician was Michael B. Buckley from Waterbury. The commissioner objected to the request for a continuance calling it a delaying tactic and noting that Francis was retired on a medical disability related to cardiac problems.
 

 The court inquired as to where Francis was at the present time. His lawyer replied: “Home, I understand. Over the last two weeks his condition has gotten worse. Experiencing pain during the day and night.”
 

 The court and the attorney then engaged in the following colloquy:
 

 “The Court: If you would give me permission, I would like to speak to Dr. Buckley about [Francis’] medical condition so I can know first hand when he has been seen and what his condition is so I can make a fair judgment here. If you give me that permission I’ll call Dr. Buckley now.
 

 “Mr. Caulfield: I don’t have specific permission to do that from my client.
 

 “The Court: Would you like to call your client and see if he can give you permission to allow me to speak to Dr. Buckley so I can confirm his doctor’s last exam of him and what his prognosis is? What his present
 
 *255
 
 status is so I can assess the necessity of doing anything here.
 

 “Mr. Caulfield: Well, I have to contact [Francis], I have to specifically—
 

 “The Court: If you want to call him. He is at home.
 

 * * *
 

 “Mr. Caulfield: I have been unable to make personal contact with [Francis] at the place he was at.
 

 “The Court: His home?
 

 “Mr. Caulfield: He left a few minutes ago and he is expected back in an hour or so.
 

 “The Court: Well, all right. I’ll keep the same ruling and proceed without him. I looked in the yellow pages in Waterbury, and Dr. Buckley is a family physician not a cardiologist. Not treating in that specialty. All right. I’ll give you a chance to reach him in an hour and if he would like to come down and join us he can. He, being [Francis], [may] leave and come to court if he would like.”
 

 After testimony was completed on November 21, 1995, the hearing next resumed on November 23, 1995. Francis was not present for this day of testimony either.
 

 Antonia testified again on the latter date. Attorney Gregory St. John, her counsel at that time, engaged her in the following colloquy:
 

 “Q. [Antonia], in a situation like this, is there something you can tell Judge Gill that would make Judge Gill understand how you would have the ability to safeguard your children in this stituation?
 

 “A. Well, I feel the best that I can do is to have Fran stay out of our house.
 

 “Q. Why?
 

 
 *256
 
 “A. If it’s the choice between, if he’s to come home and/or the children, you know, the children come first. And as far as, right now is not a good time for him to come home anyway.
 

 “Q. Why is it not a good time?
 

 “A. Well, we have been separated for six months, there is a lot of stress. It wouldn’t be appropriate for him to just come home.
 

 “Q. Do you feel that a reuniting with Fran with the family would require a period to make that adjustment take place?
 

 “A. Yes, it would.
 

 “Q. Would you cooperate in terms of counseling in order to facilitate at some point the return of Fran to the household?
 

 “A. Yes.
 

 “Q. Would you cooperate with [the department of children and families] in terms of evaluations that have to be done in order to facilitate that counseling?
 

 “A. Yes.
 

 “Q. You would do so because you put your children above your husband?
 

 “A. Right. Yes.
 

 “Q. Is there any doubt in your mind about that, [Antonia]?
 

 “A. No.”
 

 The court then proceeded on the same date to order psychological evaluations for Francis, Antonia and the two minor children pursuant to statute. Only the attorney for Francis objected, claiming his fifth amendment privilege against self-incrimination. In his attorney’s
 
 *257
 
 words, a psychological evaluation would “mandate respondent to provide potentially incriminating testimony and to permit the department of children and families and the state to go on a fishing expedition and use his own words to try to convict him in clear violation of fifth amendment rights.”
 

 Francis’ attorney’s objection to this routine examination was overruled. Francis has never submitted to a psychological evaluation, in violation of this court’s order.
 

 This case was next in court on December 6, 1995. At that time Antonia again had new counsel, Attorney William Conti. Francis was again not present. The court had ordered that Francis be present so as to respond to this apparent contempt of court by failing to take the scheduled psychological examination. The commissioner indicated that notice by publication and certified mail had both been utilized to cause Francis to be present on this date. The court had also ordered Caulfield to have his client present.
 

 “The Court: All right. [Francis] is not here today. Have you been in contact with your client, Mr. Caulfield?
 

 “Mr. Caulfield: Your Honor, I did everything that I was instructed to do by the clerk.
 

 “The Court: Have you been in contact with your client?
 

 “Mr. Caulfield: Not directly. In other words, I have had no meetings with him, I have had no conversations, but I have done everything the clerk suggested that I do. I have no knowledge of him — where he’s living or whether or not he received any of the information.
 

 “The Court: You stood up, Mr. Conti?
 

 “Mr. Conti: Yeah, I stood up because my understanding was you were going to question my client as well
 
 *258
 
 as to [Francis’] whereabouts. I have spoken to her, Your Honor, she hasn’t heard from him in three weeks. He also is not paying any money toward the household. He stopped that. Probably in response to [Antonia] telling him you have made your bed, I have to take care of the children. And that has created a problem. As a matter of fact, [Antonia], Your Honor, and we don’t know what to do, has instructed me to begin an action for a legal separation. Is that correct?
 

 “[Antonia]: Yes.
 

 “Mr. Conti: We have spent a long time talking about this case, Your Honor, which is very painful.
 

 “The Court: And unnecessary.
 

 “Mr. Conti: It is.
 

 “The Court: This could have been resolved so easily if people just cooperated.”
 

 The next hearing date was February 7,1996. Francis, again, did not attend this hearing. It was also during this time that Francis illegally began to provide Bob Fredericks, a local news editor and Sunday columnist for the Waterbury Republican-American newspaper, with selected confidential information from these closed proceedings that was personally obtained by him, Antonia and Caulfield. Francis’ obstinacy had by now delayed the resolution of these matters for many months.
 

 “Mr. Waterfall: A. Thomas Waterfall for [Antonia].
 

 “The Court: What are you, the fourth attorney?
 

 “Ms. Crawford: Sixth.
 

 “Mr. Waterfall: Sixth time is a charm, Your Honor.
 

 “The Court: We’U see.
 

 
 *259
 
 “Mr. Falco: We’re here on a motion for contempt, dated January 3, 1996.
 

 “The Court: Is [Francis] here?
 

 “Mr. Falco: I haven’t seen him.
 

 “Ms. Crawford: And I believe that Attorney Caulfield does not know the whereabouts of his client at this particular period in time.
 

 “The Court: Okay.
 

 “Mr. Caulfield: I do not know the whereabouts of [Francis].
 

 “The Court: Okay.
 

 “Mr. Caulfield: I can relate to the court, to my knowledge, he has no notice of these proceedings. Today’s proceeding.
 

 “The Court: Did you attempt to convey that information to him that this was a hearing on his behalf today?
 

 “Mr. Caulfield: Well, convey it? I have no place to locate him. I have no live address.
 

 “The Court: You don’t have any address or telephone number for him?
 

 “Mr. Caulfield: From the time I entered the second appearance on behalf of [Francis] he was already away from the marital home, family home, and he had no address. At that time, he was not living, to my knowledge, in a specific dwelling. His communications to my office were all by telephone at his leisure, so to speak.
 

 “The Court: Well, talk about digging your own hole. [Francis] already has unfavorably impressed this court in a number of areas. The final one is a real challenge in restraint and patience, frankly. And in passing, you
 
 *260
 
 know, all of these things that he is doing or not doing are harmful to the children he professes to love and care for. So I’m going to have the court issue a subpoena. If that is not done I will have a sheriff bring him in here in lock-up. I want a subpoena for him to be here next Wednesday afternoon at 2:00. I’m going to ask the Connecticut state police, using their investigatory skills to check with the Waterbury fire department to see where his check is going. His retirement check. To check with the motor vehicle department to see where his automobile is registered and licensed. To check with the Southern New England Telephone Company to see if he has a phone any place. And I’ll take it step, by step, by step. However, his inclination not to be here for this proceeding and the past, presenting what I find to be insufficient medical reasons and not being here today, even though he speaks to his children on the telephone two times a week. We have to be completely naive to believe that he doesn’t know about this proceeding. We reached the point now where I’m going to proceed in this case on the first part of the adjudication in his absence. I will . . . hold final adjudication of that to give him the opportunity to be here again next Wednesday. I’m not going to count on any more delays that have been precipitated by [Francis’] handling of his legal obligations here in court and outside of court. If you would ask, perhaps, Mr. Wittstein to expedite the request from the Connecticut state police.
 

 “Ms. Crawford: I will, Your Honor.
 

 “The Court: I fully intend to have [Francis] under oath to explain his absence here next time we see him and give him the opportunity to do it by subpoena and if that doesn’t work I think I would have to do a capias to pick him up and bring him in here. But he is not
 
 *261
 
 going to run this court the way he appears to be running other lives in the state of Connecticut.
 

 “Mr. Caulfield: May I address something other than the scheduling of these things? I’m, of course, caught in a particular situation because I represent [Francis] on the record. That is why I’m here today knowing that the practicality of his not being here wasn’t very good. I’m in a quandary. I can’t come to court with the necessary requirements of the Practice Book as to give [Francis] notice. I’m attempting to withdraw from this matter. Does it make much sense to the court for me to come up here without a client with no knowledge of what his position is at this particular point? Seems like a waste of my time and perhaps the court’s time. I can’t contribute very much to the proceedings.
 

 “The Court: I know you can’t contribute as much as I would like. We’re making a record of all of this and someday [it will] be reviewed [as to] how he has personally and I believe intentionally thwarted the court’s effort, to do justice in this case.”
 

 Subsequent, attempts to have Francis notified to appear in court on February 21, 1996, were fruitless. Sheriffs were unable to locate him. Notice by publication in the Waterbury Republican-American newspaper was equally fruitless. In that very same newspaper on February 18, 1996, the first column written by Fredericks appeared. It was headlined, ironically: “Answers aren’t easy in questions of abuse.” Fredericks indicated that he had reviewed “scores of pages of court transcripts and documents” concerning this proceeding. All done, of course, in violation of the law. This column publicly revealed the identity of the children in the
 
 *262
 
 present case, which is the reason for the confidentiality law.
 
 [1]
 

 The following colloquy occurred on February 21, 1996:
 

 “The Court: I’m offering you and your client, through you, to do that and that is up to him. Have you had any contact since your last time in court with your client?
 

 “Mr. Caulfield: Shortly, after we left here, within an hour, I’d say, Attorney Crawford provided me with a particular address in Ansonia, which I made — written to on two occasions. The letters have not come back to me and I have had no response from him. Although, Attorney Crawford informed me the day — and I’m not quite sure whether it was the sheriff or somebody from the sheriffs department inquired of the people at the address, that residence, and they indicated [Francis] only uses that as a mailing address only. He does not live there. So the fact that I sent the letters out gives me no indication whether he received them or not.
 

 “The Court: Did you say they weren’t returned?
 

 “Mr. Caulfield: They were not returned.
 

 “The Court: In your letters did you tell him about today’s proceedings?
 

 “Mr. Caulfield: My secretary’s letter. The first indicated that we were supposed to be here last week, I believe, and the second letter indicated to him that there had been a continuance date to today.
 

 
 *263
 
 “The Court: Did you indicate to him there is a subpoena out for him?
 

 “Mr. Caulfield: I don’t recall my mentioning a subpoena [was] going to be issued. I did tell him his failure to appear, based on Your Honor’s statement, a capias would have been issued against him. If my recollection serves me correctly.
 

 “The Court: I said I wanted to take it step by step. To give him every opportunity to be here or do it a little harder the next time. It is his choice.”
 

 The court subsequently issued a capias for Francis without success. This court was informed by the Connecticut state police that Francis had fled to the state of New Hampshire.
 

 Three subsequent columns by Fredericks of the Waterbury Republican-American newspaper further revealed confidential matters in the present case in terms of legal motions, pleadings and legal briefs. All in violation of the law and all repeatedly revealing the identity of the children in the present case.
 

 His subsequent columns had headlines that spotlighted his gross lack of knowledge while advocating the position of the absent Francis: “Dad Feels Controlled By Agency”; “Father Fights Conviction By Social Workers”; “Social Agency Tries To Silence All Questions.”
 

 In reality, Francis was only “controlled” by the department because he refused to cooperate in efforts to act in the best interests of his children. In reality, Francis was not “fighting” a “conviction” at all. He never appeared to “fight” in court, which is the bulwark of our democracy. Further, he was never subject to a “conviction” as this is not a criminal proceeding! Anyone with a smattering of legal knowledge knows this huge distinction. The department was not trying to “Silence
 
 *264
 
 All Questions.” Rather, the department was trying to get Francis merely to obey the laws of confidentiality. Fredericks appeared on a radio talk show and expressed similar sentiments. While defying this court, Francis appeared on television to express his dissatisfaction with the process. The reporter called him a fugitive.
 

 On May 21, 1996, Antonia vacated her prior plan of denial and filed a written plea of nolo contendere to the amended petition. Her attorney, the attorney for the minor children and the attorney for the commissioner presented proposed orders to the court, which it adopted.
 

 The court ordered exclusive guardianship and physical custody to be vested in Antonia under an order of protective supervision for one year. Antonia agreed to cooperate with the civil restraining order preventing Francis from having contact with his children until further order of the court.
 

 On that date this default was entered against Francis. The entering of the default by the court was merely an acknowledgment of the obvious. Francis has defaulted in every sense of the word. He defaulted in his obligation to the court, and most certainly in his fatherly obligations to his precious children. The only issue Francis ever saw in the present case was himself.
 

 The court hopes that when his children are of sufficient age and maturity that they will read this memorandum. Alana was absolutely, 100 percent correct in telling about her father’s unwanted touching. Francis was absolutely, 100 percent wrong in his handling of his daughter’s concerns.
 

 The court finds that with regard to Francis, Alana and Lea are neglected children based upon his actions
 
 *265
 
 and inactions. The court bases this disposition on events that have occurred prior to and including March 6, 1996.
 

 The protective order issued by this court on June 15, 1995, shall remain in full effect.
 

 [1]
 

 The court was so shocked that a newspaper reporter would write such a story using illegally given materials and after only hearing from one viewpoint in a four-sided hearing, that it placed a call to the reporter’s voice mail expressing the court’s concern about the divulgence of these confidential matters and concern that he was advocating a position without having the “story.”